**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-MD-03090-RAR**

| | |
|---|---|
| **IN RE: FORTRA FILE TRANSFER SOFTWARE DATA SECURITY BREACH LITIGATION**<br><br>**This Document Relates to: Track One** | Case No. 24-md-03090-RAR<br><br>MDL No. 3090 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED
CLASS ACTION COMPLAINT**

## I.    INTRODUCTION

Plaintiffs' Consolidated Class Action Complaint [D.E. 133] ("CAC" or "Complaint") details the facts, circumstances, and tangible harms resulting from Defendants' data breach, in which the personal identifiable information ("PII") and personal health information ("PHI") of Plaintiffs and roughly 3,000,000 others were exfiltrated by a cybercriminal group (the "Data Breach" or "Breach") because of Defendants' failure to take appropriate steps to protect the private data it collected. Plaintiffs set forth specific facts contained regarding the details of the Breach, the damage it has caused and will continue to cause to Plaintiffs and the putative class ("Class"), and the obvious steps Defendants could have taken to prevent it. Defendants' attempts to characterize these allegations as anything but sufficient fail. The Motion should be denied.

## II.    FACTUAL BACKGROUND

As set forth in the Complaint, Defendants are health benefits administrators that partner with managed care organizations to provide supplemental benefits to certain policyholders. In this role, Defendants collect highly sensitive PII/PHI from millions of their own clients and customers of partner organizations. CAC ¶ 2. To utilize Defendants' services, users such as Plaintiffs are required to provide their PII/PHI either directly or indirectly. *Id.* ¶¶ 159-62. In collecting such data, Defendants promised Plaintiffs they would use "reasonable physical, technical, and administrative safeguards" to protect customers' private information and would "only share customer information in limited circumstances." *Id.* ¶¶ 163-64. Defendants used the file-transfer program GoAnywhere MFT (developed by Fortra) to facilitate sharing of data provided to them; however, the default settings on this program were not compliant with reasonable security standards for file transfers of sensitive information like PII/PHI. *See id.* ¶¶ 168-74. While Defendants could change these default settings, which left the GoAnywhere MFT console "exposed to anyone with internet access," *id.*

¶ 174, they did not, leaving the data "accessible, unprotected, unencrypted, and therefore easily accessible for unauthorized access and exfiltration." *Id.* ¶ 185. Defendants should have been aware of these vulnerabilities and inadequacies. *See generally id.* ¶¶ 177, 194-99. Considering third parties like Fortra account for 90% of healthcare cyberattacks, Defendants knew or should have known they were likely targets of an attack. *Id.*

Between January 28 and 30, 2023, a notorious cybercriminal group, the Clop ransomware gang ("Clop"), exfiltrated vast amounts of unencrypted, highly sensitive PII/PHI of over 3 million of Defendants' customers, including Plaintiffs' full names, dates of birth, Social Security numbers, phone numbers, addresses, gender, health plan subscriber information (including identification numbers), and Medicare numbers. *Id.* ¶¶ 3-4, 12, 175-85. While Defendants learned about the Breach by February 3, 2023, they did not immediately update their systems or make other mitigation efforts. *See id.* ¶¶ 6, 188. Defendants maximized the harm caused to Plaintiffs by waiting 65 days to begin notifying victims of the Breach, thwarting Plaintiffs' ability to mitigate the harm. *Id.* ¶¶ 3, 7, 190. And even when Defendants notified their victims, their notice omitted information about the scope of the attack, including what data was stolen. *Id.* ¶¶ 191-92, 244.

The type of PII/PHI exfiltrated from Defendants' systems is extremely valuable on the dark web. It permits hackers to commit identify theft and medical fraud, creating a material risk of present and future harm and loss of privacy and confidentiality. *Id.* ¶¶ 5, 12-17, 182, 229-42. While all Plaintiffs and the Class are at risk of such future harm, several Plaintiffs have already suffered misuse of their PII/PHI after Defendants' Breach. *Id.* ¶¶ 27, 37, 42, 47, 57, 62, 72, 77, 82, 102, 107, 112, 117, 122, 127, 132, 137, 142, 147, 152. Plaintiffs have also suffered emotional distress from the theft of their PII/PHI. *Id.*; *see also id.* ¶¶ 32, 52, 67, 87, 92, 97. Such misuse and likely future misuse have resulted in classwide harms. *Id.* ¶ 240. Further, Defendants still possess

Plaintiffs' and the Class's PII/PHI, their data security measures remain inadequate, and they have not provided any assurances that they have or will improve their data security practices. *See id*. ¶¶ 16, 19, 192, 331-32. Thus, Plaintiffs seek to hold Defendants responsible for the injuries inflicted on them and millions of similarly situated people due to Defendants' inadequate security measures.

## III.     LEGAL STANDARD

A Rule 12(b)(6) motion should be granted only if, after accepting all allegations as true and construing the pleadings in the light most favorable to the plaintiffs, the defendant demonstrates a failure to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Dismissal is inappropriate "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 603 F. Supp. 3d 1198 (S.D. Fla. 2022) ("*Mednax I*").

A facial subject matter jurisdiction attack under Rule 12(b)(1) "requires the Court to merely look at the complaint to see if the Plaintiff has sufficiently alleged a basis for subject matter jurisdiction, and the allegations in the complaint are accepted as true for purposes of the motion to dismiss." *Butts v. ALN Grp., LLC*, 512 F. Supp. 3d 1301, 1305 (S.D. Fla. 2021).

## IV.     ARGUMENT

### A.     Plaintiffs Have Standing to Pursue Their Claims Under Rule 12(b)(1).

Plaintiffs allege multiple injuries satisfying the Article III standing threshold. A plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Defendants only challenge "injury-in-fact" and "traceability." This Court has twice ruled, following the guidance in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190

(2021), that allegations like the ones here are sufficient as to injury-in-fact and traceability. *See Desue v. 20/20 Eye Care Network, Inc.*, 2022 WL 796367, at *5-7 (S.D. Fla. Mar. 15, 2022); *Mednax I*, 603 F. Supp. 3d at 1205-06. Defendants' challenges to standing fail.

### 1.    Plaintiffs Suffered Injury-in-Fact.

To establish injury-in-fact, a plaintiff must show they "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339. An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Id*. An injury is concrete when it is "real," not "abstract." *Id*. at 340. The injury need not be large: "a small injury, an identifiable trifle, is sufficient to confer standing." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009) (citation omitted). Importantly, intangible injuries like the threat of future injury may also be concrete, which "may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted).

### a.    Plaintiffs Allege Concrete Harm Based on the Risk of Identity Theft Resulting from the Theft of Their Private Information.

In considering whether Plaintiffs have alleged injury-in-fact from an increased risk of identity theft, this Court should follow *In re 21st Century Oncology Customer Data Sec. Breach Litig.*, 380 F. Supp. 3d 1243 (M.D. Fla. 2019), *Mednax I*, 603 F. Supp. 3d at 1200-1204, and *Desue*, 2022 WL 796367, at *3-6. In *21st Century Oncology*, the court identified three "commonalities" where an increased risk of identity theft confers standing. 380 F. Supp. 3d at 1251.[1]

*First,* "a plaintiff is more likely to establish an injury in fact based on the increased risk of

---

[1] The First, Second, and Third Circuit Courts of Appeals recently formulated similar analyses in *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023), *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 301-02 (2d Cir. 2021), and *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 153-54 (3d Cir. 2022).

identity theft where the plaintiff has alleged that the third party behind the data breach targeted the plaintiff's personal information with an intent to use the information fraudulently." *Id.* at 1252. Where hackers intentionally steal PII/PHI, plaintiffs face a substantial risk of a certainly impending injury because "a primary incentive for hackers is 'sooner or later to make fraudulent charges or assume those consumers' identities.'" *Id.* For this reason, courts have found that victims of hacker-initiated data breaches have Article III standing.[2]

Here, the Breach resulted from an attack against Defendants by Clop, which exfiltrated vast amounts of unencrypted, highly sensitive information. CAC ¶ 3. Defendants *admit* Clop acquired Plaintiffs' unencrypted PII/PHI. *Id.* ¶ 4. Moreover, Plaintiffs allege Clop gave Defendants the opportunity to repurchase the stolen data, but Defendants refused. *Id.* As a result, Clop sold the PII/PHI on the dark web. *Id.* The theft and sale of the Class's PII/PHI supports the inference that Clop stole and sold the information for use in identity theft. As the Eleventh Circuit recently confirmed, the posting of financial and personal information on the dark web "establishes both a present injury—credit card data and personal information floating around on the dark web—and a substantial risk of future injury—future misuse of personal information associated with the hacked credit card . . . that is sufficient to establish Article III standing." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F. 4th 883, 890 (11th Cir. 2023).

*Second*, courts are more likely to find injury-in-fact when immutable data that can be used to commit fraudulent acts, such as personal and medical identity information, is compromised. *See 21st Century Oncology*, 380 F. Supp. 3d at 1253; *Tsao v. Captiva MVP Rest. Partners, LLC*, 986

---

[2] *See, e.g.*, *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967 (7th Cir. 2016) (collecting cases); *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015); *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1216 (N.D. Cal. 2014); *In re Zappos.com, Inc.*, 888 F.3d 1020, 1027-29 (9th Cir. 2018). As explained in *Galaria v. Nationwide Mut. Ins. Co.*, "[w]here a data breach targets [PII], a reasonable inference can be drawn that the hackers will use the victims' data for the fraudulent purposes alleged in Plaintiffs' complaints." 663 F. App'x. 384, 388 (6th Cir. 2016).

F.3d 1332, 1342-43 (11th Cir. 2021) (contrasting unchangeable types of PII to payment card data).

Here, the PII/PHI exfiltrated and sold on the dark web "includes, but is not limited to, full names, dates of birth, Social Security numbers, phone numbers, addresses, gender, health plan subscriber information, including identification numbers, and Medicare numbers." CAC ¶ 12. Hackers use these exact types of PII/PHI to commit identity theft, including medical fraud, creating a material risk of harm for standing. *See*, *e.g.*, *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1274 (11th Cir. 2021) (recognizing the "unique risks associated with stolen Social Security numbers"); *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 461 (D. Md. 2020) (finding a material risk of identity theft when names, addresses, phone numbers, emails, passport numbers, and dates of birth were stolen).[3]

*Third*, courts "have found that an increased risk of identity theft is more likely to constitute an injury-in-fact where there is evidence that a third party has accessed the secretive information and/or already used the compromised data fraudulently." *21st Century Oncology*, 380 F. Supp. 3d at 1254; *see also Mednax I*, 603 F. Supp. 3d at 1202. Here, Plaintiffs allege Clop accessed and misused their PII/PHI, placing them at a present and continuing risk for identity theft. CAC ¶¶ 5, 16-17. Plaintiffs allege instances of fraudulent misuse of their PII/PHI. Plaintiff Caliendo's health insurance company contacted her regarding numerous suspicious charges for Covid tests post-dating the Breach. *Id*. ¶ 27. Plaintiff Dekenipp experienced an increase in intrusive spam calls, texts, and emails following the Breach. *Id*. ¶ 30. Plaintiff T.E. received numerous calls asking her to activate her NationsBenefits card, despite already possessing an activated card. *Id*. ¶ 37. Plaintiff

---

[3] Defendants' argument that "only eleven [Plaintiffs] allege that their Social Security numbers were potentially impacted in the [Breach]" is thus unavailing. Mot. at 12. The Eleventh Circuit recognizes that other types of information, including birth dates, driver's license numbers, and health insurance information are also extremely valuable to thieves. *See Tsao*, 986 F.3d at 1342-43; *accord. 21st Century Oncology*, 380 F. Supp. 3d at 1253.

Fideleff received an email supposedly from Geek Squad stating she was being billed for an unauthorized transaction and requesting she let them control of her computer to resolve the issue. *Id*. ¶ 42. Plaintiff Fuss experienced numerous unauthorized account openings and fraudulent debit card charges. *Id.* ¶ 47. This is just a sample of many alleged instances of actual fraudulent misuse Plaintiffs have experienced to date from of the Breach. *See generally id.* ¶¶ 23-152.

Thus, Plaintiffs' allegations satisfy all three hallmarks of an injury-in-fact caused by a risk of future identity theft, making this case factually distinguishable from *Tsao*. Like *21st Century Oncology*, the Eleventh Circuit in *Tsao* found "the cases conferring standing after a data breach based on an increased risk of theft or misuse included at least some allegations of actual misuse or actual access to personal data," whereas the cases finding no standing were cases "where the plaintiffs failed to allege any actual misuse of class members' personal information." 998 F.3d at 1340-41. The outcome in *Tsao* was unsurprising given its facts. There, the plaintiff's payment card information was compromised when a hacker exploited the point-of-sale system at the restaurant where the plaintiff had made purchases using two separate credit cards, but it was unclear if the data was accessed by any unauthorized party, and the plaintiff promptly cancelled his two affected credit cards. *Id*. at 1345. Unlike Plaintiffs here, the *Tsao* plaintiff did not plead identity theft, attempted misuse of his information, or even indications of access to his information. *Id.* at 1336.

Defendants incorrectly claim that because some Plaintiffs do not allege misuse of their PII/PHI, they lack Article III standing. Mot. at 2. Allegations from even a single plaintiff of actual misuse of the compromised PHI/PII is sufficient to confer standing on all named plaintiffs. As the Eleventh Circuit explained in *Equifax*, the fact that *some* of the plaintiffs have alleged actual misuse of their PII is sufficient to confer standing on *all* of the named plaintiffs. 999 F.3d at 1263 ("Beyond the sufficient risk of identity theft and resulting injuries, a vast number of Plaintiffs who

have not yet suffered identity theft also allege they have spent time, money, and effort mitigating the risk of identity theft. . . . As explained above, because the risk of harm here is a sufficient injury, the allegations of mitigation injuries made by these Plaintiffs are also sufficient."); *see also In re Marriott*, 440 F. Supp. 3d at 460 (explaining that those bellwether plaintiffs who did not allege actual misuse of their PII adequately pled imminent threat of identity theft because "the allegations about the targeting of personal information in the cyberattack and the allegations of identity theft by other Plaintiffs whose personal information was stolen makes the threatened injury sufficiently imminent."); *Mednax I*, 603 F. Supp. 3d at 1202 (recognizing plaintiffs' allegations of actual misuse are "helpful in establishing a 'substantial risk' of future harm for plaintiffs who remain unaffected"). Here, because at least some Plaintiffs have alleged actual misuse, the imminent risk to all other Plaintiffs and the Class conveys standing.

> **b.    Plaintiffs Allege Concrete Harm Based on Loss of Privacy and Confidentiality of Their Private Information.**

Plaintiffs' allegations of loss of privacy and confidentiality of their PII/PHI establish an injury-in-fact. *See Mednax I*, 603 F. Supp. 3d at 1205 (finding plaintiffs' loss of privacy conferred standing because "unauthorized third parties, and possibly criminals, gained access to their PHI and PII"); *see also Doe v. Chao*, 540 U.S. 614, 641 (2004) (standing existed where plaintiff was "greatly concerned and worried" by disclosure of his Social Security number and its potential consequences) (citation omitted); *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 290 (2d Cir. 2023) (explaining that, in and of itself, the exposure of a plaintiff's private PII to unauthorized third parties is sufficiently concrete). Like the *Mednax* plaintiffs, Plaintiffs have demonstrated they are "under a substantial and imminent risk of future identity theft" by alleging that Clop exfiltrated their PII/PHI and then sold it on the dark web. CAC ¶¶ 2-4, 14, 62, 92, 122, 181-82.

### c.   Plaintiffs' Allegations Regarding the Loss of Value of Their Private Information Establish a Concrete Harm.

Plaintiffs also allege they suffered the lost or diminished value of their PHI/PII because of the Breach—a harm Defendants wrongly refer to as "gibberish," despite the increasing recognition, including from this Court, that such harm is a cognizable injury where plaintiffs allege actual identity theft or misuse of the compromised information. *See*, *e.g.*, *Mednax I*, 603 F. Supp. 3d at 1204; *In re Marriott*, 440 F. Supp. 3d at 460-61 (recognizing "the growing trend across courts that have considered this issue is to recognize the lost property value of [PII]" (collecting cases)); *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 803-04 (N.D. Cal. Jan. 14, 2022) (collecting cases).

The actual value of Plaintiffs' PHI/PII is a factual question to be determined at a later stage, and Plaintiffs are not required to allege an attempted sale of their PHI/PII or that they "were forced to accept a decreased price for their information" to allege injury. *In re Marriott*, 440 F. Supp. 3d at 462 (the value of PII "is not derived solely (or even realistically) by its worth in some imagined marketplace . . . but rather in the economic benefit the consumer derives from being able to purchase goods and services remotely and without the need to pay in cash or a check").

### d.   Plaintiffs Allege Concrete Harm Based on the Time and Costs Spent to Mitigate the Harm Resulting from the Breach.

Several Plaintiffs allege that, to protect themselves from post-Breach identity theft, they spent time and/or money monitoring their credit and accounts for fraudulent activity. These mitigation efforts constitute injury-in-fact. The Eleventh Circuit clarified in *Equifax* when it is appropriate to incur injuries "while mitigating a risk of harm, such as purchasing a credit freeze or spending time or effort to minimize a risk of identity theft." 999 F.3d at 1262. It explained that an "assertion of wasted time and effort necessarily rises or falls along with this Court's determination of whether a risk of injury is a concrete harm[,]" and thus, "the time, money, and effort spent mitigating" a substantial risk of injury are also concrete injuries. *Id.*. Moreover, the court explained

that even plaintiffs who had not yet suffered any identity theft could state a concrete harm because "[t]he actual identity theft already suffered by some Plaintiffs further demonstrates the risk of identity theft all Plaintiffs face—though actual identity theft is by no means required when there is a sufficient risk of identity theft." *Id.* at 1262-63. This Court in *Mednax I* and *Desue* reached the same conclusion. *See Mednax I*, 603 F. Supp. 3d at 1204; *Desue*, 2022 WL 796367, at *4-5 (same).

Here, Plaintiffs purchased credit freezes, monitored their financial accounts, and purchased credit monitoring, among other things. Because the risk of harm here is an injury-in-fact, the allegations of lost time to mitigate harm are also sufficient. *Mednax I*, 603 F. Supp. 3d at 1263.

   e.   **Plaintiffs Allege Concrete Harm Based on the Continuing Emotional Distress Suffered as a Result of the Breach.**

Defendants challenge Plaintiffs' claims by concocting a rule that allegations of emotional distress can never confer standing. *See* Mot. at 16. The Supreme Court, however, has declined to adopt a bright-line rule and instead recognized that "a plaintiff's knowledge that he or she is exposed to a risk of future physical, monetary, or reputational harm could cause its own current emotional or psychological harm." *TransUnion*, 141 S. Ct. at 2211 n.7 (taking no position on whether emotional distress suffices for standing purposes). As this Court correctly recognized in *Desue*, "the Court in *TransUnion* . . . propound[ed] that emotional injury may be an independent harm caused by plaintiffs' exposure to the risk that their credit reports would be provided to third-party businesses." 2022 WL 796367, at *4 (internal punctuation omitted). The Eleventh Circuit recently described wasted time and emotional distress arising from a failure to provide disclosures regarding the cost of a consumer loan as "garden-variety injuries" for purposes of Article III standing. *Walters v. Fast AC, LLC*, 60 F.4th 642, 649 (11th Cir. 2023). The wasted time and emotional distress arising from the disclosure of confidential information are equally concrete.

Moreover, the alleged emotional distress here is tangible. Plaintiffs T.E., Fuss, and A.T.,

for example, specifically allege they now must take anxiety medications (or increased dosages of anxiety medications) to alleviate their distress from the theft of their PII/PHI in the Breach. CAC ¶¶ 37, 47, 127; *see ExecuPharm*, 48 F.4th at 158 (finding allegations of emotional distress and therapy costs resulting from data breach were concrete injuries).

### 2. Plaintiffs' Allegations of Actual Misuse Establish Traceability.

Article III requires Plaintiffs "to allege that their injuries are 'connect[ed] with the conduct of which [they] complain.'" *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019). "Even a showing that a plaintiff's injury is indirectly caused by a defendants' actions satisfies the fairly traceable requirement." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012). "'[F]airly traceable' does not mean 'certainly traceable.'" *Mednax I*, 603 F. Supp. 3d at 1205.

Plaintiffs' allegations easily satisfy this standard. Plaintiffs allege their PII/PHI was accessed and exfiltrated by criminals because of Defendants' negligence. CAC ¶¶ 173-188. It resulted in identity theft (increases in spam emails, text messages, and phone calls), economic losses, lost time, and emotional injuries, *see, id.* ¶¶ 27, 37, 42, 47, 57, 62, 72, 77, 82, 102, 107, 112, 117, 122, 127, 132, 137, 142, 147, 152, as well as causing a substantial risk of future identity and medical fraud, which directly flow from Defendants' actions and omissions.

Defendants' standard is both too strict for the motion to dismiss stage and conflates merits with standing. For example, Defendants claim that it is "simply inconceivable for Plaintiffs to suggest, much less plausibly allege, any traceability of the alleged actual misuse to the [Breach] or any alleged conduct of NationsBenefits." Mot. at 18. But that is irrelevant to standing and ignores the CAC's well-pled allegations regarding Clop's aggregation of PII/PHI to compile "complete dossiers of Private Information" to sell on the dark web and misuse to target victims. *See, e.g.*, CAC ¶ 229. Indeed, "that 'some other store might [also] have caused the plaintiffs'

private information to be exposed does nothing to negate the plaintiffs' standing to sue' for the breach in question." *In re Zappos.com*, 888 F.3d at 1029. Many courts have rejected motions raising similar traceability challenges to standing in data breach cases, finding they are better suited for a later litigation stage. *See, e.g.*, *Fero v. Excellus Health Plan, Inc*., 236 F. Supp. 3d 735, 757, 758 (W.D.N.Y. 2017) (collecting cases); *Lewert*, 819 F.3d at 969; *Remijas*, 794 F.3d at 696.

Regardless, Plaintiffs T.E., Fuss, King, Lazaroff, Sanders, Shepherd, Skurauskis, A.T., Wilcynski, Wilson, and Wolsey meet the traceability requirement for the identity theft they suffered. Defendants' argument that there is no nexus between the Breach and the alleged misuse of Plaintiffs' PII/PHI is premised on multiple false factual assumptions. For example, without any expert analysis, Defendants claim that because credit or debit card information was not impacted in the Breach, Plaintiffs Sanders and Shepherd cannot "plausibly allege" traceability from their fraudulent debit card transactions to the Breach. Mot. at 17-18. But courts have rejected similar arguments. *See, e.g.*, *Weisenberger v. Ameritas Mut. Holding Co.*, 597 F.Supp.3d 1351, 1359 (D. Neb. 2022) (finding it "plausible that with access to the plaintiff's name, Social Security number, address, date of birth, and other PII, a hacker could gain access to the plaintiff's credit records and credit card accounts and cause the damages that the plaintiff alleged in her amended complaint.") (citations omitted). Additional arguments—including (a) whether Plaintiffs' information is on the dark web; (b) whether Plaintiff Caliendo's alleged misuse occurred before or after January 29, despite Plaintiffs' allegations that misuse occurred "between January and April 2023" CAC ¶ 27; and (c) whether Plaintiffs Kosbab and Shepherd alleged misuse occurred "following the Data Breach" and "[s]ince the Data Breach" (*id.* ¶¶ 62, 112, respectively)—ignore the Complaint's well-pled facts and conflate the merits with standing.

### 3.      Plaintiffs Have Standing to Pursue Injunctive Relief.

To seek declaratory or injunctive relief, Plaintiffs must demonstrate there is "a substantial likelihood" of injury in the future. *A&M Gerber Chiropractic LLC v. GEICO Ins. Co.*, 925 F.3d 1205, 1210-11 (11th Cir. 2019). Plaintiffs demonstrate standing, based not only on the occurrence of the Breach, but by showing they suffered actual instances of identity theft, and that Defendants still retain their data. CAC ¶¶ 23-152, 331-32. Because Defendants continue to possess Plaintiffs' PII/PHI, their inadequate data security measures put Plaintiffs' information in continued jeopardy. Plaintiffs have standing to pursue a claim for declaratory and injunctive relief. *See Mednax I*, 603 F. Supp. 3d at 1205 (finding Plaintiffs' alleged injuries "constitute injuries in fact sufficient to satisfy claims for injunctive relief and damages."); *Desue*, 2022 WL 796367, at *4-5 (same); *Fischer v. CentralSquare Techs., LLC*, 2021 WL 10558134, at *6 (S.D. Fla. Sep. 15, 2021) (same).

### B.      Plaintiffs Adequately State Their Common Law Claims.

### 1.      Plaintiffs Sufficiently Allege Negligence.

An entity "collect[ing] sensitive, private data from consumers," has "a duty to protect that information." *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017); *accord Farmer v. Humana, Inc.*, 582 F. Supp. 3d 1176, 1185 (M.D. Fla. 2022). Defendants breached this duty when their inadequate security protections allowed the theft of Plaintiffs'—and millions of other individuals'—PII/PHI. Although the attack vector of the Breach was a vulnerability in Fortra's program, Defendants are not absolved of their own direct responsibility to protect Plaintiffs' data and their role in enabling the Breach. Plaintiffs allege the attackers gained access to Plaintiffs' sensitive information because of *Defendants'* failure to properly configure the Fortra program and implement policies and procedures that comply with standard information security practices. CAC ¶¶ 173-74, 177-78, 185. The Complaint therefore focuses on Defendants'

13

breaches of their duty to safeguard Plaintiffs' PII/PHI. While discovery will shed further light on Defendants' security failures, Plaintiffs have sufficiently alleged those failures at this stage.

A duty in Florida can arise out of "legislative enactments or administration regulations," *Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003). Every state in which Plaintiffs reside has a data breach notification law requiring expeditious notification of individuals whose PII/PHI was lost in a data breach.[4] Four states require notification within a specified period of 30, 45, or 60 days. *See* Fla. Stat. Ann. § 501.171 (30 days); Ind. Code § 24-4.9-3-3 (45 days); ORC 1349.19 (45 days); Tex. Bus. & Com. Code § 521.053(b) (60 days). And HIPAA's privacy and security rules require notification "without unreasonable delay and in no case later than 60 calendar days after discovery of a breach." 45 C.F.R. §§ 161.404; 164.410(b); 164.404(b). Plaintiffs allege Defendants unreasonably waited over two months from the discovery of the Breach—65 days—before sending notification letters. *See* CAC ¶¶ 7, 105, 110.[5] Thus, contrary to Defendants' argument that their notification was "timely and in accordance with applicable law" (Mot. at 23), there is no question they breached their duty to timely notify Plaintiffs and the Class.

## 2.    Plaintiffs Sufficiently Allege Negligence Per Se.

Defendants challenge Plaintiffs' negligence per se claim on the basis that it cannot arise out of federal statutes without private causes of action. Their assessment of the law, and Plaintiffs' Complaint, is incomplete. In Florida, negligence per se actions may arise out of the "violation of

---

[4] Ark. Code Ann. § 4-110-105 (no unreasonable delay); Cal. Civ. Code § 1798.82(a) (same); 815 Ill. Comp. Stat. Ann. 530/10 ("immediately"); Kan. Stat. § 50-7a01 *et seq.* (as soon as possible); Mich. Comp. Laws § 445.63, 72 *et seq.* (without unreasonable delay), Mo. Rev. Stat. § 407.1500.2(1)(a) (without unreasonable delay), N.J. Stat. § 56:8-163(a) (same), N.Y. Gen. Bus. Law § 899-aa (same), N.C. Gen. Stat. §§ 75-65(a) (same); 73 Pa. Stat. § 2303(a) (same).

[5] Indeed, the majority of Plaintiffs received their notice letters even later, on April 21, 27, and 28. CAC ¶¶ 30, 35, 40, 45,50, 60, 65, 70, 75, 80, , 85, 90, 95, 100, 115, 120, 125, 130, 135, 140, 145, 150. This delay was unreasonable and prevented Plaintiffs from taking immediate defensive measures to protect their valuable PII/PHI. *Id.* ¶ 7.

a statute which establishes a duty to take precautions to protect a particular class of persons from a particular[] injury or type of injury." *Resnick*, 693 F.3d at 1325 (quoting *Davis v. Otis Elevator Co.*, 515 So. 2d 277, 278 (Fla. 5th DCA 1987)). While some Florida district courts have found that HIPAA and the FTC Act do not support a finding of legislative intent to support negligence per se, but no binding precedent precludes this Court from coming to the opposite conclusion.

Even so, Defendants do not argue that Plaintiffs' negligence per se claims cannot arise out of the state law analogues to HIPAA and the FTC Act, as pled in the Complaint. *See* CAC ¶ 284. Instead, they argue that the Complaint failed to put them on notice of which state laws provide the basis for Plaintiffs' negligence per se claims. Rule 8 does not require Plaintiffs to cite every statute that forms the basis of their negligence per se claim. *See, e.g.*, *Welch v. Loftus*, 776 F. Supp. 2d 222, 226 (S.D. Miss. 2011) ("Rule 8 does not demand that a plaintiff claiming negligence per se include within his Complaint an explicit citation to authority simply for the sake of doing so. So long as the Complaint alleges particular conduct that clearly violates a statute or regulation, it pleads negligence per se with sufficient particularity."); *Debord v. Grasham*, 2014 WL 3734320, at *1 (W.D. Va. July 28, 2014) (finding that a negligence per se claim need not cite the state statutory basis). Where courts have found that a lack of cited statutes warrants dismissal, the complaints failed to cite both statutory authority and sufficient facts to put defendants on notice of their claims. *See, e.g.*, *Deitrick v. Costa*, 2015 WL 1606714, at *9 (M.D. Pa. Apr. 9, 2015) (dismissing negligence per se claim where plaintiff failed to plead a state or particular conduct). That is not the case here. Plaintiffs specified that the statutes forming the basis of these claims were HIPAA and FTC Act analogues, specifically those creating duties in "data security and consumer protection statutes," and pointed to the more than 20 state statutes as examples of those forming the basis of the claim. CAC ¶ 284. Plaintiffs also plead the conduct that Defendants

undertook to violate these statutes. *Id.* ¶¶ 283-84. This is sufficient to provide notice to Defendants of the basis of Plaintiffs' negligence per se claims. Plaintiffs' state law-based negligence per se claims may proceed, even if their federal basis is dismissed.

### 3. Plaintiffs Sufficiently Allege Breach of Implied Contract.

Defendants' argument that Plaintiffs' detailed allegations regarding the existence of the contract giving rise to their claim (CAC ¶¶ 296-301), breach and causation (*id.* ¶¶ 303-310), and damages (*id.* ¶¶ 311-12), fail to state a claim because Defendants did not directly invite and solicit Plaintiffs to provide their PII/PHI ignores the most recent and on point case law finding that implied contracts exist where a user is forced to provide sensitive information to use a service. Indeed, "where a patient hands over personal information to a health services provider, courts have found that course of conduct sufficient to imply a contract even where a written one does not exist." *Gilbert v. BioPlus Specialty Pharmacy Servs., LLC*, 2023 WL 3555006, at *3 (M.D. Fla. Mar. 3, 2023) (finding "because Plaintiffs' doctors and insurance companies supplied their PII to BioPlus so Plaintiffs could use BioPlus's services, they have sufficiently alleged an implied contract"); *see also Fischer*, 2021 WL 10558134, at *3; *Resnick*, 693 F.3d 1327-28; *Farmer*, 582 F. Supp. 3d at 1187. Courts outside this Circuit routinely conclude the same,[6] and this Court should as well. Such a conclusion would be consistent with Florida Standard Jury Instruction 416.6, which provides that "[c]onduct will create a contract if the conduct of both parties is intentional and each knows, or under the circumstances should know, that the other party will understand the conduct as creating a contract." *Id.*, adopted by 116 So. 3d 284, 308 (Fla. 2013). Plaintiffs plausibly allege

---

[6] *See, e.g.*, *Castillo v. Seagate Tech., LLC*, 2016 WL 9280242, at * 9 (N.D. Cal. Sept. 14, 2016) ("While [defendant] made no explicit promises as to the ongoing protection of personal information, it is difficult to imagine how in our day and age of data and identity theft, the mandatory receipt of [PII/PHI] would not imply the recipient's assent to protect the information sufficiently); *McKenzie v. Allconnect, Inc.*, 369 F. Supp. 3d 810, 821-22 (E.D. Ky. 2019) (claim stated against employer who suffered data breach because implied in the employment contract was an obligation to keep sensitive information confidential).

that Defendants knew, or should have known, that collecting and storing Plaintiffs' PII/PHI in an Internet-accessible environment would lead Plaintiffs to understand Defendants were agreeing to secure the PII/PHI. Moreover, as Defendants acknowledge, Mot. at 25-26, Plaintiffs do not rely on Defendants' privacy notice in support of their claim. Thus, Defendants' HIPAA duties to protect Plaintiffs' PII/PHI does not bar Plaintiffs' breach of implied contract claim. *See Mednax I*, 603 F. Supp. 3d at 1221-22 (finding provisions of defendant's privacy policy, which informed patients of their rights under HIPAA, could not create contractual obligation).

### 4.    Plaintiffs Sufficiently Allege Their Third-Party Beneficiary Claim.

Plaintiffs have adequately stated each element of their claim for third-party beneficiary contract: "NationsBenefits entered into contracts to provide services to its clients" (CAC ¶ 289); the contracts were made "expressly for the benefit of Plaintiffs and the Class and . . . the benefit of collection and protection of [Plaintiff/the Class's] Private Information . . . was the direct and primary objective of the contracting parties" (*id.* ¶ 290); Defendants "breached [their] contracts with [their] clients" (*id.* ¶ 292);[7] and Plaintiffs were damaged by the breach (*id.* ¶ 293. Defendants incorrectly argue Plaintiffs' allegations are insufficient as to the second element because Defendants provide the services to their clients and not Plaintiffs (indeed, the definition of a third-party beneficiary contract), and because Plaintiffs did not allege facts showing that Defendants "clearly and explicitly expressed their intent for the contract to benefit [Plaintiffs]." Mot. at 24-25 (citing *Fischer*, 2021 WL 10558134, at *4). In *Fischer*, this Court found the plaintiffs failed to allege breach of a third-party beneficiary contract because they did not highlight specific

---

[7] Defendants mistakenly argue that Plaintiffs do not allege that Defendants breached their contract by failing to use reasonable data security measures. *See* ECF No. 59 at 24 n.12. Defendants cite CAC ¶ 292 to support this argument, but the very next paragraph expands on the nature of Defendants' breach and says "[a]s foreseen, Plaintiffs and the Class Members were harmed by Defendants' failure to use reasonable data security measures to store the Private Information Plaintiffs and Class Members provided to their respective health plans…" *Id.* ¶ 293.

contractual language evidencing an intent to benefit third parties. *Id.* But unlike in *Fischer*, where the contracts at issue were accessible to the plaintiffs at the time of pleading, the contracts at issue here are not available to Plaintiffs without discovery.

Further, numerous courts have found that requiring plaintiffs to plead specific language of contracts to which they were not party is at minimum inconsistent with the motion to dismiss standard—perhaps even impossible. *See, e.g.*, *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 920 (S.D. Cal 2020); *Johnson v. Nissa N. Am., Inc.*, 272 F. Supp. 3d 1168, 1181 (N.D. Cal. 2017) ("While [plaintiff] does not cite specific provisions from the alleged contracts between [defendant] and its dealers, *it would be inappropriate to impose such a duty at the pleadings stage, prior to the benefit of discovery.*") (emphasis added). There is no reasonable way for Plaintiffs to know the terms of Defendants' contracts with its clients, and this Court should conclude that Plaintiffs' allegations about the substance of the contracts—collecting and protecting Plaintiffs' PII/PHI—and Plaintiffs' allegations that this was "the direct and primary objective of the contracting parties" are sufficient at this early stage of the proceedings. CAC ¶ 290.

### 5.   Plaintiffs Sufficiently Allege Unjust Enrichment.

Despite Defendants' attempts to show otherwise, Plaintiffs allege a direct relationship with Defendants sufficient to support their alternative claim for unjust enrichment. Florida courts have correctly rejected the notion that a benefit may not be conferred "directly" when that benefit passes through an intermediary. *See Rapar, LLC v. Mansfield*, 2020 WL 9549665, at *6 (S.D. Fla. Aug. 26, 2020) ("[M]any cases in this district . . . have permitted an equitable claim to survive a motion to dismiss even when the benefit was conferred through an intermediary—making clear that direct contact is not required."); *see also, e.g.*, *Carriuolo v. Gen. Motors LLC*, 72 F. Supp. 3d 1323, 1326 (S.D. Fla. 2014); *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1317 (S.D. Fla. 2014).

Plaintiffs' provision of their PII/PHI to Defendants through their insurance provider is this exact situation, where the benefit flowed through an intermediary to ultimately benefit Defendants. Defendants benefitted immensely from the collection, analysis, and use of Plaintiffs' data, and it would be inequitable to insulate it from liability for their failures to protect that information simply because Plaintiffs' personal information passed through a third-party intermediary.

Even so, Plaintiffs sufficiently plead many ways Defendants directly collected data from customers and users, even when those individuals received access to Defendants' services through insurance providers. *See* CAC ¶ 159 ("Plaintiffs and Class Members whose insurance or managed care organizations partner with NationsBenefits are often required to share their sensitive PII/PHI with NationsBenefits in order to receive the member benefits to which they are entitled"); *Id.* ¶¶ 161-62 (detailing direct collection methods). Indeed, Defendants specifically warn users their services may require the provision of their PII/PHI. *Id.* ¶ 160. Further, at least one Plaintiff, T.E., pleads she directly provided Defendants her personal information when she obtained a NationsBenefits card. *Id.* ¶ 37. Even if this Court dismisses the other Plaintiffs' claims, Plaintiff T.E.'s claim survives. Defendants' role as a behind-the-scenes provider means that, absent discovery, Plaintiffs cannot know the exact instances Defendants directly collected their data.

Plaintiffs' relationship with Defendants is thus distinguishable from cases such as *Desue*, where there was no direct contact with the defendants alleged at all and no circumstances in which direct contact may have been made. 2022 WL 796367, at *8. The plaintiffs in *Desue* did not raise, nor did the Court consider, whether the relationship was direct or through an intermediary.

### 6.    Plaintiffs Adequately Pleaded Their Declaratory Judgment Claim.

To state a claim for declaratory relief, a plaintiff must "assert a reasonable expectation that the injury [she] ha[s] suffered will continue or will be repeated in the future." *Fischer*, 2021 WL

10558134, at \*6. For example, allegations that the purported class "remain[s] at imminent risk that further compromises of their Payment Data will occur in the future" and that Defendants had "remedied the vulnerabilities that have resulted in data breach after data breach" are sufficient to show a reasonable expectation of future harm. *Id.* As discussed *supra* § IV.A.3, Plaintiffs clearly allege reasonable expectation of a future injury, with allegations similar to those in *Fischer*. CAC ¶ 331 ("Defendants still possesses the Private Information belonging to Plaintiffs and Class Members); *id.* ¶ 332 ("Plaintiffs allege that [Defendants'] data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises . . . will occur in the future."). Defendants' conclusory argument that the relief Plaintiffs seek is duplicative ignores the fact that the risk of imminent future harm Plaintiffs face will not be resolved through the other claims. *See Fischer*, 2021 WL 10558134, at \*6; *see also In re The Home Depot Inc., Payment Data Sec. Breach Litig.*, 2016 WL 2897520, at \*4 (N.D. Ga. May 18, 2016) (denying defendants' motion to dismiss declaratory relief claim where plaintiff alleged defendants' inadequate security measures and future risk of substantial harm).

### C.    Plaintiffs Have Adequately Stated Their State Law Statutory Claims.

#### 1.    Arkansas Deceptive Trade Practices Act ("ADTPA")

Defendants argue violations of ADTPA are limited to only those that relate to "the improper application of economic leverage in a trade transaction." Mot. at 27. But ADTPA is not so narrow. In addition to specific unlawful acts, ADTPA includes a catch-all provision that prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade." Ark. Code. Ann. § 4-88-107(a)(10). Because the legislature "could not be expected to envision every conceivable violation" of ADTPA, the Arkansas Supreme Court has

long held that the catch-all provision must be liberally construed to include state interests that protect the public. *State ex rel. Bryant U. R & A Inv. Co., Inc.*, 336 Ark. 289, 295-96 (1999); *see also Universal Coops., Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795 (8th Cir. 2013) ("[U]nconscionable" conduct includes "false representation" and "fraud").

Unlike *Bellwether Cmty. Credit Union v. Chipotle Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1091 (D. Colo. 2018), the ADTPA claim is not premised on a mere violation of another statute. Rather, Plaintiffs alleged Defendants failed to implement and maintain reasonable security and privacy measures in the face of serious risks, misrepresented it would protect the confidentiality of the PII/PHI, and failed to disclose it did not, in fact, properly secure it. CAC ¶ 346. Plaintiffs have stated a claim that Defendants' failures were unconscionable.

### 2. California Customer Records Act ("CCRA")[8]

Defendants incorrectly argue Plaintiffs do not allege Defendants failed to maintain reasonable security practices or to timely notify Class Members of the Breach. Mot. at 27-28. *First*, as explained in detail *supra* §§ II, IV.B.1, Defendants' own security failures left the Class's data vulnerable to exploitation. These are "sufficient allegations of unreasonable cybersecurity practices under the [CCRA]." *Mednax I*, 603 F. Supp. 3d at 1219-20. As in *Mednax I*, allegations that PHI/PII was stored using "unencrypted email accounts" in violation of industry best practices is sufficient. *Id. Second*, Plaintiffs allege Defendants failed to timely notify the Class of the Breach. Defendants argue "the timeline for providing notification of a data breach is governed by HIPAA" and assert they complied. Mot. at 28. However, HIPAA's privacy and security rules required Defendants to provide notification of the Breach "without unreasonable delay" and within "*60 calendar days after discovery* of a breach." 45 C.F.R. §§ 164.410(b) & 164.404(b) (emphasis

---

[8] Plaintiffs agree to dismiss their California Consumer Privacy Act Claim.

added). Yet, even though Fortra notified Defendants of the exploit by February 3, 2023, Defendants did not notify any Class Members until at least April 13, 2023. CAC ¶ 190. This unreasonable delay violated HIPAA's regulations and the CCRA. *See In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1150 (C.D. Cal. 2021) (three month delay unreasonable). And it prevented the Class from taking immediate action to protect their PII/PHI. CAC ¶ 7.

### 3.    California Unfair Competition Law ("UCL")

Defendants raise a litany of unpersuasive arguments against the California UCL claim. *First*, they prematurely argue the UCL claim fails to allege they lack an adequate remedy at law.[9] Regardless, Plaintiffs' UCL injunctive relief claims are well-pled since they seek to remedy future harms from repeated data breaches due to Defendants' continued failures to protect PII/PHI. *See McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017) (explaining purpose of UCL injunctive relief is to prevent future harm). In contrast, Plaintiffs' remedies at law solely redress their past Breach injuries and cannot prevent their future injuries. Thus, Plaintiffs lack an adequate remedy at law for future harms, and at the very least, their injunctive UCL claims should proceed. *See Chaplin v. Walmart, Inc.*, 2023 WL 4843956, at *6 (N.D. Cal. May 25, 2023) ("[A] plaintiff may bring both CLRA and UCL claims so long as she show[s] the monetary damages for past harm are an inadequate remedy for the future harm that an injunction under California consumer protection law is aimed at. [A plaintiff's CLRA] remedy at law, damages, is retrospective. An injunction is prospective.") (cleaned up).

*Second*, Defendants argue Plaintiffs fail to allege reliance on any alleged

---

[9] At the pleading stage, Plaintiffs may allege their equitable claims under the UCL in the alternative. *See McKay v. Sazerac Co., Inc.*, 2023 WL 3549515, at *8 (N.D. Cal. May 17, 2023) (permitting plaintiffs to allege equitable claims in the alternative "at the early pleadings stage"); *Johnson v. Trumpet Behav. Health, LLC*, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) ("[I]f a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case.").

misrepresentations or omissions. But the California Supreme Court has held reliance on misrepresentations or omissions is only required in UCL cases sounding in fraud. *See In re Tobacco II Cases*, 46 Cal. 4th 298, 325 n.17 (2009) ("There are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application."). Where, as here, claims under the UCL's "unfair" and "unlawful" prongs are based not on deceptive advertising, but on Defendants' failure to implement reasonable security practices—reliance is not required. *Accord. Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015, 1020 (N.D. Cal. 2019). Irrespective of reliance, the UCL claims under the "unfair" and "unlawful" prongs are well-pled.[10]

### 4. Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

Defendants argue that Plaintiffs' FDUTPA claim fails because they do not allege diminution in value of the goods and services received. Yet, Defendants do not contest that Plaintiffs have sufficiently pled a deceptive act or practice and causation. Nor do they contend that Plaintiffs cannot seek declaratory and injunctive relief. Thus, at a minimum, Plaintiffs' claim for declaratory and injunctive relief are well pled. *See In re Mednax Servs., Inc., Customer Data Sec. Breach Litig.*, 2022 WL 3550045, at *1-3 (S.D. Fla. Aug. 18, 2022) ("*Mednax II*"). Regardless, Plaintiffs allege Defendants' conduct reduced the value of the property that is the subject of the consumer transaction—healthcare services. *See* CAC ¶ 243.

Furthermore, recent decisions have recognized that there is "a much larger universe of damages available in FDUTPA claims arising outside the consumer transaction context … especially when considered alongside the liberal construction courts must afford the FDUTPA to accomplish its remedial purpose." *Tymar Distrib. LLC v. Mitchell Grp. USA, LLC*, 558 F. Supp.

---

[10] Regarding the "fraudulent" prong, which requires reliance, Plaintiffs allege reliance "on Defendants' promise to keep their PII/PHI confidential and securely maintained, and to only make authorized disclosures of this information. [Defendants] failed to do so." CAC ¶ 166.

3d 1275, 1286 (S.D. Fla. Sept. 8, 2021). In *Tymar*, the court found that actual or compensatory damages are those which "arise from actual and indirect pecuniary loss, mental suffering, value of time, actual expenses, and bodily pain and suffering." *Id.* at 1285 (quotations omitted).

Here, Plaintiffs seek compensation for the loss of the inherent value of PII/PHI, the costs associated with detecting and preventing future identity theft and unauthorized use of their medical information, and the costs associated with time spent attempting to mitigate the serious consequences of the Breach. CAC ¶ 240. Plaintiffs would not have paid what they did for their health plans with Defendants services had they known that Defendants would not adequately protect their data. *Id.* ¶¶ 242-43. *See Griffey v. Magellan Health Inc.*, 2022 WL 1811165, at *8 (D. Ariz. June 2, 2022) (finding FDUTPA damages sufficiently alleged where plaintiff "allege[d] that he overpaid for health services that [defendant] in some way administers because [defendant]'s data security was inadequate"). Because these damages are cognizable under long-standing Florida law, Plaintiffs' FDUTPA claim is well-pled.

### 5.    Illinois Personal Information Protection Act ("IPIPA")

Defendants argue the IPIPA claim is insufficiently pled because notice of the Data Breach was given in accordance with applicable law. But as explained earlier (*see supra*, § IV.C.2), Defendants' notice violated HIPAA's 60-day notice requirement after it discovered the Breach. 45 C.F.R. § 164.404(b); *see In re Michaels Stores Pin Pad Litig.*, 830 F. Supp. 2d 518, 527-28 (N.D. Ill. 2011). It was also incomplete, omitted critical information about what data was stolen, and excluded the scope of the Breach in violation of IPIPA. CAC ¶¶ 191-92.

### 6.    Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

Defendants argue the ICFA does not apply because the transaction occurred primarily out of state, only citing a case about a nonresident's claims. *See Irwin v. Jimmy John's Franchise,*

24

*LLC*, 175 F. Supp. 3d 1064, 1069 (C.D. Ill. Mar. 29, 2016) ("A *nonresident plaintiff* may sue under the Consumer Fraud Act only if the circumstances giving rise to the cause of action occurred 'primarily and substantially in Illinois.'") (emphasis added). By contrast, the Illinois Plaintiffs are all Illinois residents. CAC ¶¶ 23, 83, 88. Thus, ICFA applies. *See Moore v. Compass Grp. USA, Inc.*, 2019 WL 4723077, at *11 (E.D. Mo. Sep. 26, 2019) ("a plaintiff's residency is the predominant factor for pursuing an ICFA claim"). Defendants also assert Plaintiffs' "generalized allegations" do not state an ICFA claim. Mot. at 30. But Plaintiffs' allegations are not generalized. They specifically detail Defendants' failure to maintain reasonable security and privacy measures through its implementation and configuration of the GoAnywhere MFT console, leaving Class Members' unencrypted private data exposed to anyone with Internet access. CAC ¶¶ 168-85.

### 7.      Illinois Uniform Deceptive Trade Practices Act ("IUDTPA")

Defendants contend Plaintiffs have not alleged any facts showing their conduct is likely to cause future injury. Not so. The CAC detailed Defendants' woefully inadequate security and privacy practices that left PII/PHI ripe for exfiltration by hackers (*id.* ¶¶ 168-85), that Defendants have not provided any assurances they have or will improve their data security practices (*id.* ¶ 192), and that Plaintiffs' PII/PHI is at risk of exfiltration again because it remains in Defendants' hands (*id.* ¶¶ 19, 192). These allegations distinguish this case from *Fox v. Iowa Health Sys.*, 399 F. Supp. 3d 780, 799 (W.D. Wis. July 25, 2019), and *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 768 (C.D. Ill. Apr. 20, 2020), in which the courts found harms surrounding the future misuse of already stolen data were insufficient under IUDTPA because the allegations went to "the risk of harm that [the plaintiff] face[d] *from the data breaches themselves*, not the risk of harm that she face[d] if [the defendant] continue[d] to misrepresent" its services. *Fox*, 399 F. Supp. 3d at 799-800 (emphasis added). Here, because Plaintiffs allege Defendants' security remains inadequate,

an injunction would redress their risk of future harm—all that IUDTPA requires.

### 8.    Indiana Deceptive Consumer Sales Act ("IDCSA")

Defendants argue that the IDSCA claim is deficient because there was no notice of uncured or incurable deceptive acts. Plaintiff Shepherd alleges an *incurable* deceptive act. CAC at ¶ 449. The IDCSA defines an "incurable deceptive act" as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). That is exactly what is alleged here. Despite knowing that its security and privacy measures did not comply with reasonable standards, Defendants failed to warn Shepherd or the Indiana Subclass of their deficient practices. CAC ¶ 437. And they misrepresented that they would protect the confidentiality of Shepherd's and the Indiana Subclass's PII/PHI. *Id.* Those allegations suffice. *See Bray v. Gamestop Corp.*, 2018 WL 11226516, at *7 (D. Del. Mar. 16, 2018) (The Defendant's "failure to inform customers about its noncompliant data security" created the inference that GameStop's conduct constituted an incurable deceptive act).

Defendants' argument that there was no "consumer transaction" fares no better. The IDCSA defines a consumer transaction as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household[.]" Ind. Code § 24-5-0.5-2(a)(1). Courts have interpreted this definition broadly. *See, e.g.*, *In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d 313, 326 (E.D. Pa. Mar. 23, 2011) (finding transaction between third-party payors and drug manufacturer constituted "consumer transaction"); *Staley v. Gilead Scis., Inc.*, 589 F. Supp. 3d 1132, 1137-38 (N.D. Cal. Mar. 8, 2022) (finding transaction between insurer and pharmaceutical company was "consumer transaction"). In fact, "the IDCSA does not require a direct transaction between the plaintiff and the defendant involving the sale of

goods." *In re Actiq Sales & Mktg. Pracs. Litig.*, 790 F. Supp. 2d at 326. "[T]here is no mandate …

that the plaintiff must be the consumer who purchased the goods [ ] for personal purposes." *Id.*[11]

### 9.    Kansas Protection of Consumer Information Act ("KPCIA")

Defendants wrongly argue they are exempt from the KPCIA because they are HIPAA

regulated. The KPCIA only exempts an entity "regulated by state or federal law and that maintains

procedures for a breach of the security of the system pursuant to the laws, rules, regulations,

guidances or guidelines established by its primary or functional state or federal regulator…." Kan.

Stat. Ann. § 50-7a02(e). Plaintiff A.T. alleges Defendants violated HIPAA by using a non-

compliant third-party file application and failing to configure it for HIPAA compliance. CAC

¶¶ 170-74. Defendants further violated HIPAA's privacy and security rules by failing to notify

consumers of the Breach within 60 days after discovery. 45 C.F.R. § 164.404(b); CAC ¶¶ 186-93.

As Defendants bear the burden of proof for this exemption defense, whether they maintained

HIPAA-compliant security procedures is a fact question that cannot be decided on the pleadings.[12]

### 10.    Kansas Consumer Protection Act ("KCPA")

As with their IDCSA position, Defendants argue there is no "consumer transaction" under

the KCPA. This argument fails again. Kansas follows an expansive definition of consumer

transactions and "encompass[es] situations where no actual exchange of value for property or

services has occurred." *See Martinez v. Hobbs Mech.*, 492 P.3d 506 at *6 (Kan. Ct. App. 2021)

(citing Kan. Stat. Ann. § 50-624). Considering the KCPA's wide breath, Defendants' conduct, as

a company that administers benefits for managed care companies that Plaintiffs contracted with,

---

[11] Defendants only cite *Mackey v. Belden, Inc.*, 2021 WL 3363174, at *42 (E.D. Mo. Aug. 3, 2021), which holds that an employer-employee relationship is not a consumer transaction. *Id.*

[12] Defendants' suggestion that the KPCIA may not permit a private right of action is also meritless. Numerous courts have found that it does. *See, e.g.*, *Perdue*, 455 F. Supp. 3d at 767; *In re Equifax*, 362 F. Supp. 3d at 1341; *In re Target*, 66 F. Supp. 3d at 1169.

easily qualifies. *See Moral v. PHH Mortg. Corp.*, 2022 WL 4016583, at *9 (D. Kan. Sept. 2, 2022) (holding that the KCPA may apply to companies that enforce consumer transactions "whether or not dealing directly with the consumer") (quoting Kan. Stat. Ann. § 50-264).[13]

### 11.    Michigan Consumer Protection Act ("MCPA")

Defendants assert the Court must dismiss the MCPA claim because Plaintiffs do not allege actual reliance. Defendants ignore the well-pled Complaint, alleging reliance "on NationsBenefits' promise to keep their [PII/PHI] confidential and securely maintained, and to only make authorized disclosures of this information." CAC ¶ 166. Plaintiffs also allege reliance "on NationsBenefits to ensure that it held vendors with whom it shared sensitive Private Information to the same high standards of data protection." *Id.* ¶ 167. Because Defendants did neither, this claim is well-pled.

### 12.    Missouri Merchandise Practices Act ("MMPA")

Defendants argue the MMPA claim does not allege any unlawful action relating to the purchase of merchandise. But in two recent healthcare data breach cases, district courts have found that plaintiffs sufficiently pled that the failure to implement and maintain reasonable security and privacy measures was sufficient to state an MMPA claim. *See Sweet v. BJC Health Sys.*, 2021 WL 2661569, at *9 (S.D. Ill. June 29, 2021) (finding that defendants' security representations regarding agreement to provide medical services stated an MMPA claim); *K.A. v. Child's Mercy Hosp.*, 2019 WL 13207485, at *4 (W.D. Mo. May 17, 2019) (holding that the MMPA "does not require that the *purchase* be caused by the unlawful practice"). Further, Defendants administer benefits through the collection and use of PII/PHI obtained from insurance providers and employers. CAC ¶ 133-34. Unlike *Mednax*, data security is fundamental, not incidental to Defendants' business. *See Mednax I*, 603 F. Supp 3d at 1215 n.14. This claim is well-pled.

---

[13] Defendants' cited case law does not address what qualifies as a consumer transaction.

### 13.    New Jersey Consumer Fraud Act ("NJCFA")

Defendants again argue there was no consumer transaction, incorrectly relying on *In re Blackbaud, Inc.*, 2021 WL 3568394, at *10-12 (D.S.C. Aug. 12, 2021). Blackbaud sold services to "sophisticated businesses and entities, not the general public." *Id.* at *10. The *Blackbaud* plaintiffs neither purchased nor used any Blackbaud services, nor were they aware the company even existed. *Id.* at 11. In that context, the court held they were not NJCFA consumers. *Id.* at *12. By contrast, Plaintiff Wilczynski alleges he received benefits from Defendants, was informed of the breach of his information by Defendants, and suffered identity theft because of his relationship with Defendants. CAC ¶¶ 134-37. He has therefore stated a claim for violation of NJCFA.

### 14.    New York General Business Law § 349 ("NYGBL")

Defendants contend that the NYGBL claim must be dismissed because they are not headquartered in New York. Mot. at 33. But as this Court clarified, "where a defendant keeps its headquarters and conducts its business is irrelevant." *Mednax II*, 2022 WL 3550045, at *4 (cleaned up). Courts have interpreted the NYGBL's requirement that the act occur "in this state" to mean that "to qualify as a prohibited act under section 349, the *deception of a consumer* must occur in New York." *Id.* (emphasis added) (cleaned up). "A narrow reading of section 349's territorial requirement thus looks at where a plaintiff was deceived." *Id.* at *5. Because Plaintiffs Wanser and Landries reside in New York, received Defendants' services and notice of the Breach in New York, and experienced harm in New York, the NYGBL applies.

Defendants also assert that, even if New York law applies, Plaintiffs do not identify any deceptive statements and cannot state a claim. This argument also lacks merit. For one, the Eleventh Circuit has confirmed that "private actions brought under § 349 do not require proof of actual reliance." *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1311 (11th Cir. 2023)

(citation and internal quotation marks omitted). Moreover, Plaintiffs alleged: (1) Defendants promised Plaintiffs they would "use reasonable physical, technical, and administrative safeguards" to protect customers' PII/PHI (CAC ¶ 163); (2) that they would "only share customer information in limited circumstances," which do not include cybercriminals (*id.* ¶ 164); and (3) that Defendants failed to disclose that third parties would "collect, process, and store PHI protected under HIPAA" (*id.* ¶ 165). In short, reliance on Defendants' promises to keep their PII/PHI confidential is alleged. *Id.* ¶ 1660. Defendants broke those promises. That is more than sufficient to state an NYGBL claim. *See Wallace v. Health Quest Sys.*, 2021 WL 1109727, at *15 (S.D.N.Y. Mar. 23, 2021) (finding that defendants' statements that it was "committed to protecting medical information" and would notify customers of any data breach without unreasonable delay stated an NYGBL claim); *Fero*, 236 F. Supp. 3d at 774-75 (finding allegations that defendants would "maintain adequate data privacy and security practices" and "comply with the requirements of relevant federal and state laws" plausibly alleged violation of the NYGBL).[14]

### 15.    North Carolina Identity Theft Protection Act ("NCITPA")

Defendants assert there is no private right of action under NCITPA, ignoring the statute's plain language, stating there is no private right of action "*unless such individual is injured as a result of the violation.*" N.C. Gen. Stat. § 75-65(i) (emphasis added). North Carolina federal and state courts allow private plaintiffs alleging injuries to bring NCITPA claims. *See, e.g., Curry v. Schletter Inc.*, 2018 WL 1472485, at *5-7 (W.D.N.C. Mar. 26, 2018); *Fisher v. Comm. Workers of Am.*, 2008 WL 4754850, ¶¶ 55-64 (N.C. Sup. Ct. Oct. 30, 2008) (same). Defendants argue these claims must be brought under the North Carolina Unfair Trade Practices Act, not NCITPA, but

---

[14] *Rider v. Uphold HQ Inc.*, 2023 WL 2163208 (S.D.N.Y. Feb. 22, 2023), does not hold otherwise. Unlike Plaintiffs here, the plaintiff there "failed to identify any specific deceptive statement" the defendants made. *Id.* at *3.

the two remedies are not mutually exclusive. While NCITPA "expressly provides that a violation of [NCITPA] is also a violation of the [N]UDTPA," that simply means that if plaintiffs state valid claims under NCITPA, they "*also state* valid claims under [NDUTPA]." *Curry*, 2018 WL 1472485, at *6 (emphasis added). Regardless, Plaintiffs may bring these claims under NDUTPA.[15]

**16.      North Carolina Unfair Trade Practices Act ("NDUTPA")**

Defendants also argue the NDUTPA claim must be dismissed because Plaintiffs do not allege Defendants had a duty to disclose any alleged omissions. But in addition to the omissions claim, the CAC alleges Defendants violated NDUTPA by making affirmative misrepresentations and by violating NCITPA. Because Defendants did not move to dismiss those theories of liability under NDUTPA, they survive. As for omissions, this Court previously found allegations like those in the CAC were sufficient to allege a duty to disclose because defendants possessed "exclusive knowledge regarding their data security, active[ly] conceal[ed] the state of their security, [and made] incomplete representations about the security and integrity of their computer and data systems." *Mednax I*, 603 F. Supp. 3d at 1216. Likewise, the CAC alleges Defendants knew or should have known that their third-party vendors like Fortra were being frequently attacked, that its GoAnywhere MFT had numerous past security vulnerabilities, that its configuration of the software was insecure and unencrypted (and that it failed to change those insecure settings), and that its industry was being targeted by the Clop hackers. CAC ¶¶ 170-74, 196-98. Defendants also promised they would "use reasonable physical, technical, and administrative safeguards" to protect PII/PHI and would "only share customer information in limited circumstances"—not with hackers. *Id.* ¶¶ 163-64. They did neither. At the pleading stage, these allegations are sufficient.

---

[15] *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, 2021 WL 5937742 (D.N.J. Dec. 16, 2021), incorrectly held that the only courts to consider this language have found the claims must be brought under NDUTPA. *Id.* at *35-36. As discussed above, North Carolina courts hold the opposite. *See Curry*, 2018 WL 1472485, at *5-7; *Fisher*, 2008 WL 4754850, ¶¶ 55-64.

### 17.    Ohio Consumer Sales Practices Act ("OCSPA")

Defendants repeat their lack of consumer transaction argument (or substantially similar conduct under Ohio law). OCSPA prohibits suppliers from committing "an unfair or deceptive act or practices *in connection with* a consumer transaction," whether it occurs "before, during, or after the transaction." Ohio Rev. Code § 1345.02(A) (emphasis added). And it defines a "supplier" as "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, *whether or not the person deals directly with the consumer*." Ohio Rev. Code § 1345.01(C) (emphasis added). Here, Plaintiffs alleged they received benefits from Defendants, were informed of the Breach by Defendants, and suffered identify theft because of their relationship with Defendants. CAC ¶¶ 54-57, 60-62, 64-67. Thus, Plaintiffs adequately allege Defendants undertook deceptive data security in connection with a consumer transaction.

### 18.    Ohio Deceptive Trade Practices Act ("ODTPA")

Defendants assert that Plaintiffs lack standing to pursue an ODTPA claim. While there is a split of authority on this issue, the plain language of the statute allows a consumer to bring suit. *See Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 630-33 (S.D. Ohio Sept. 18, 2014). ODTPA's language "plainly provides that a 'person' may 'commence a civil action' against another 'person' who has committed a 'deceptive trade practice,' and included within the statutory definition of 'person' is an 'individual' along with a litany of legal or commercial entities." *Id.* at 632 (cleaned up).[16] Indeed, "[o]ne might well ask the question why the word 'individual' was included in the definition had the Ohio General Assembly not intended to give individual consumers the standing to sue under the ODTPA." *Id.*; *see also Bower*, 495 F. Supp. 2d at 843 ("".

---

[16] Interpreting the inclusion of "any other legal or commercial entity" in ODTPA's definition of persons as placing a limit on the rest of the definition "would ignore the words 'any other.'" *Bower v. IBM*, 495 F. Supp. 2d 837, 843 (S.D. Ohio 2004). By stating that "any other legal or commercial entity" may be considered a person, the Ohio legislature "did not limit the scope of the preceding list but expanded it." *Id.*

Because Defendants do not deny that Plaintiffs are individuals, they have standing under ODTPA.

Defendants also wrongly contend the claim fails to allege reliance. Ohio Plaintiffs allege they "relied on Defendants' promise to keep their Private Information confidential and securely maintained, and to only make authorized disclosures of this information" (CAC at ¶ 166) and "relied on Defendants to ensure that it held vendors with whom it shared sensitive Private Information to the same high standards of data protection" (*id.* ¶ 167). Defendants did neither.

### 19.     Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL")

Defendants incorrectly assert Plaintiff Fuss cannot state a claim for violation of PUTPCPL because he did not allege any "ascertainable losses" or plead "justifiable reliance." As Defendants acknowledge, Plaintiff Fuss alleges that following Defendants' Breach, he experienced identity theft. CAC ¶ 47. Banks contacted him about accounts he did not open, and fraudulent charges appeared on his debit card. *Id.* As a result, he lost $4,800 due to fraudulent charges stemming from the Breach. *Id.*[17] Defendants rely on *In re Rutter's Inc. Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 541 (M.D. Pa. Jan. 5, 2021), to support their argument that he has no ascertainable losses. But *Rutter's* merely found that the plaintiffs' time remediating a breach, where they spent no money and lost no property, was insufficient to state a claim under PUTPCPL, but one plaintiff's "tangible loss of money" was sufficient. *Id.* Where, as here, Plaintiff Fuss "pleads a quantifiable amount of money he lost due to the data breach," his alleged loss is sufficient to satisfy PUTPCPL. *Id.*

Plaintiff Fuss also sufficiently pleads justifiable reliance. Like the other Plaintiffs, he alleges he relied on Defendants' promise to secure and maintain his PII/PHI and ensure that

---

[17] That Fuss's debit card may not have been stolen directly is irrelevant. The breach of *other PII* allows hackers to commit identity theft and financial harm. CAC ¶ 223. The exposure of any private data "can cause unexpected harms one would not ordinarily associate with the type of information solen." *Id.* ¶¶ 229-30; *see supra* n.3.

vendors who had access to the same were held to those standards. CAC ¶¶ 166-67. At the pleading

stage, that is sufficient. *See Offley v. Fashion Nova, LLC*, 2023 WL 6201558, at *5 (D. Mass. Sep.

22, 2023); *see also Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 55 (2007) (holding "justifiable reliance

is typically a question of fact" not subject to dismissal).[18]

### 20. Texas Deceptive Trade Practices Consumer Protection Act ("TDTPA")

Defendants contend the TDTPA claim does not allege a consumer transaction. Texas—like

Indiana, Kansas, New Jersey, and Ohio—broadly allows consumers to bring suit for deceptive

practices. The TDTPA defines a "consumer" as "an individual . . . who seeks or acquires by

purchase or lease, any goods or services." Tex. Bus. & Com. Code § 17.45(4). Because Plaintiffs

Dekenipp, Wilson, and Sanders each allege they received services from Defendants by virtue of

their health-care plans, they are consumers. CAC ¶¶ 29, 104, 144; *see In re Cap. One Consumer*

*Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 427 (E.D. Va. 2020) (holding plaintiffs who received

credit lines from Capital One had standing to bring TDTPA data-breach claims).

### 21. FRCP 9(b)

NationsBenefits proclaims in several footnotes that Plaintiffs' CUCL, IDCSA, TDTPA,

and NCUDTPA claims fail to meet Rule 9(b)'s heightened pleading standard. *See* Mot. at 29 n.15,

31 n.16, 34 n.17, 35 n.18. These arguments fail for two reasons.

*First*, even if the Court were to consider NationsBenefits' Rule 9(b) arguments, Plaintiffs'

CUCL, IDCSA, TDTPA, and NCUDTPA claims are well-pled and survive NationsBenefits'

motion. To satisfy FRCP 9(b)'s heightened pleading standard, "claims of fraud must be plead with

particularity, which means identifying the who, what, when, where, and how of the fraud alleged."

---

[18] *Rutter's* is distinguishable. In *Rutter's*, plaintiffs "did not allege that they read or were even aware of the
policy when they purchased products." *Offley*, 2023 WL 6201558, at *5. Here, by contrast, Plaintiff Fuss
relied on Defendants' specific security and privacy statements.

*Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022). But 9(b)'s heightened standard "must not abrogate the concept of notice pleading." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988). Plaintiffs' allegations satisfy this standard. Plaintiffs identify promises and omissions made by NationsBenefits in its Privacy Policy, including "that it will 'use reasonable physical, technical, and administrative safeguards' to protect customers' Private Information," "that it will only share customer information in limited circumstances, none of which include sharing with the cyber criminals that facilitated the Breach," and that NationsBenefits failed to inform them it would share their PII/PHI with third parties. CAC ¶¶ 163–65, 203–04, 437, 443, 591, 539. Plaintiffs allege they would not have shared their PII/PHI with their health insurer had they known of NationsBenefits' security failings. *E.g.*, *id.* ¶¶ 31, 36, 106, 111, 146.

*Second*, even under Rule 9(b)'s heightened pleading standard, knowledge "may be alleged generally." Here, it is alleged that NationsBenefits knew or should have known that (1) third-party vendors like Fortra were frequently attacked (CAC ¶ 196); (2) GoAnywhere MFT experienced numerous security vulnerabilities (*id.* ¶ 172); (3) the Clop hackers primarily targeted the healthcare industry and file transfer services (*id.* ¶ 199); and (4) extensive harm would occur if the Class's PII/PHI was exposed in a breach. *Id.* ¶ 201.

These allegations are sufficient at the pleading stage to survive a motion to dismiss. *See Bray*, 2018 WL 11226516, at *7 (IDCSA and NCUDTPA); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 427.

## V.      CONCLUSION

For the reasons detailed above, the Court should deny the Motion to Dismiss in its entirety or, in the alternative, dismiss without prejudice and permit Plaintiffs to amend their Complaint.

Dated: April 25, 2024

Respectfully submitted,

By: *Jeff Ostrow*
Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
ostrow@kolawyers.com

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
John Allen Yanchunis FBN 324681
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Telephone: (813) 275-5272
jyanchunis@forthepeople.com

*MDL Co-Lead Counsel for Plaintiffs*

**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi (*pro hac vice*)
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com

*MDL Track Coordination and Settlement*
*Counsel for Plaintiffs*

**TYCKO & ZAVAREEI LLP**
Sabita J. Soneji (*pro hac vice*)
1970 Broadway, Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
ssoneji@tzlegal.com

**BARNOW AND ASSOCIATES, P.C.**
Ben Barnow (*pro hac vice*)
205 W. Randolph St., Suite 1630
Chicago, IL 60606
Telephone: (312) 621-2000
b.barnow@barnowlaw.com

*Plaintiffs' Track 1 Leads*